No. 3--04--0427

Filed January 20, 2009

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2009

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--326 |
| ANTHONY P. OLIVER, | ) ) | Honorable Ted J. Hamer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McDADE delivered the opinion of the court:

The defendant, Anthony P. Oliver, was charged with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(B) (West 2002)) and unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(B) (West 2002)). He filed pretrial motions to suppress his confession and to quash his arrest, which the circuit court denied. After a bench trial, the court found the defendant guilty on both counts, but that the latter count would merge into the former count. The court sentenced the defendant to 10 years of imprisonment on the former count. On appeal, the defendant argued that the arresting officer illegally detained him following a traffic stop, thereby tainting the subsequent search that resulted in the discovery of cocaine in the trunk of the vehicle. The defendant also argued,

in the alternative, that he was entitled to $65 credit against his fines for presentence incarceration. In prior decisions, we reversed and remanded. The Illinois Supreme Court has entered a supervisory order directing this court to vacate our judgment and reconsider our decision in light of People v. Cosby, 231 Ill. 2d 262 (2008). After reconsideration, we reverse and remand.

FACTS

At the suppression hearing, Henry County Deputy Sheriff Glenn Hampton testified that, during the early morning hours of November 14, 2002, he observed a vehicle following another vehicle too closely on Interstate 80. Hampton initiated a traffic stop of the offending vehicle.

Hampton approached the driver's side of the vehicle, where he found the defendant in the driver's seat and Orlando James in the passenger's seat. Hampton asked for the defendant's license; however, the defendant gave Hampton a state identification card. Hampton placed the defendant in the passenger's seat of the squad car while he ran the defendant's card. The dispatcher informed Hampton that the defendant did not have a valid driver's license.

In response to Hampton's inquiry, the defendant stated that he had problems with his license due to an error attributable to the Secretary of State. Hampton did not arrest the defendant; he merely stated that the defendant needed to resolve that situation.

At some point while the defendant was in the squad car, Hampton approached James to make sure he had a valid driver's

license.  The dispatcher informed Hampton that James was on mandatory supervised release from the Department of Corrections, although Hampton was not told for what James had been incarcerated.  After Hampton received the information regarding the defendant, the vehicle, and James, Hampton returned the defendant's card and informed the defendant that he was "free to go" as long as James drove.

At that time, Hampton asked the defendant if there were any weapons or contraband in the vehicle.  Hampton testified that he was suspicious of "a very strong smell of an aroma, of some sort of fragrance, real strong," coming from inside the vehicle.  Hampton stated that vehicles transporting contraband sometimes use strong fragrances as masking agents.

The defendant answered that there were no weapons or contraband in the vehicle.  In response, Hampton asked the defendant if he was certain of that.  The defendant said yes, he was certain, but also told Hampton that he could search the vehicle if he wanted.  Hampton took the defendant's statement as consent to search the vehicle.

Hampton next approached the passenger's side of the vehicle and asked James to exit the vehicle.  Hampton informed James that the defendant consented to a search of the vehicle and asked James for consent to search.  James consented.  After placing James near the rear of the vehicle and the defendant at the front of the vehicle, Hampton began his search.  The only item Hampton found in the vehicle's interior was a liquor bottle containing

3

the same fragrance emanating from the vehicle.

Hampton then asked James for consent to search the trunk. James consented. Hampton also asked the defendant for consent to search the trunk. The defendant also consented. During his search of the trunk, Hampton found a plastic baggie containing cocaine in the wheel well of the vehicle.

The defendant later gave a voluntary written statement to Hampton, stating that he was taking the cocaine to a party, but that he was not intending to sell the cocaine. He also stated that he was "ready to leave the streets" and give up using drugs.

The defendant testified that he was driving a vehicle west on Interstate 80 on the morning in question. James was in the passenger's seat. The vehicle belonged to James' wife. The defendant stated that he was in the left lane, passing a truck that was in the right lane. Hampton's squad car was turning around in a u-turn area on the interstate. The defendant passed Hampton, and Hampton began following the defendant. Hampton then pulled the defendant over.

Hampton approached the driver's side and asked the defendant for his license. The defendant responded that he only had a state identification card because someone in Connecticut had been using his name. Hampton then placed the defendant in the squad car.

Hampton ran the defendant's card, which came back as suspended. Hampton exited the squad car and approached James, who gave Hampton his information verbally because he did not have

4

his license on him.  Hampton returned to the squad car and ran James's license.  The dispatcher told Hampton that James was on parole.  Hampton then returned the defendant's card and told him that he was free to go.  The defendant admitted that he felt free to go at that point.

Hampton next informed the defendant that he was going to search the vehicle, and that, if there was nothing in the vehicle, James would have to drive.  Hampton then asked the defendant if there were guns or drugs in the vehicle.  The defendant said Hampton never asked him whether Hampton could search the vehicle.  The defendant stated that his door was locked and that he no longer felt free to leave after Hampton said he was going to search the vehicle.

Hampton exited the squad car and approached James, whom he had exit the vehicle.  Hampton returned and had the defendant exit the squad car.  Hampton placed the defendant at the front of the vehicle and James at the rear.  Hampton then began to search the vehicle.

After Hampton searched the interior, he opened the trunk and began to search it.  The defendant stated that Hampton did not ask him for consent to search the trunk and that he did not hear Hampton ask James for consent to search the trunk.

During his search of the trunk, Hampton rose up with his gun drawn and told the defendant to "freeze" and to put his hands on his head.  Hampton then made the defendant walk around to the back of the vehicle, where he cuffed the defendant and James.

5

The defendant stated that his written statement was untrue. He stated that Hampton told the defendant what to write because the defendant had to "impress the State" in order to get the intent charge dropped. Additionally, the defendant stated that Hampton encouraged him to talk to James regarding the incident to ensure they had the same version of what happened. On recall, Hampton denied telling the defendant what to write and denied encouraging the defendant to talk to James regarding the incident.

Orlando James testified that, on the morning in question, he was the passenger in his wife's vehicle. The defendant was driving. Hampton pulled them over and approached the driver's side of the vehicle. The defendant rolled the window down, and Hampton said he pulled the defendant over for following another vehicle too closely.

The defendant gave Hampton a state identification card, and Hampton took the defendant back to the squad car while he ran the defendant's card. About 10 minutes later, Hampton approached James. He asked for James' license. James said that he had a license, but that he did not have it on him. James then gave Hampton his personal information, and Hampton returned to the squad car.

Hampton returned about 10 minutes later with the defendant walking slightly behind him. Hampton asked James to exit the vehicle and told the defendant to go to the front of the vehicle. Hampton then asked James if he had any contraband on him, to

6

which James said no.  Hampton asked for and received James's consent to search James' person.  Hampton then placed James at the rear of the vehicle.

Hampton then began searching the vehicle's interior.  James stated that Hampton never asked if he could search the vehicle and that he never heard Hampton ask the defendant if he could search the vehicle.  After searching the interior, Hampton began searching the trunk.  He opened the trunk with the key.  Again, James stated that Hampton did not ask for consent to search the trunk and that he did not hear Hampton ask the defendant for consent to search the trunk.

With regard to the alleged events surrounding the defendant's written statement, James stated that Hampton told him that Hampton knew the State's Attorney personally and that Hampton was going to try to help them out by getting the intent charge dropped.  James also stated that Hampton told him that he needed to "follow up" with the defendant's version of what happened in order to convince the State's Attorney to drop the intent charge, and that Hampton actually told him several parts of the defendant's version.  James stated that Hampton placed him in the same room with the defendant for five minutes to "talk it over."

On April 4, 2003, the circuit court denied the defendant's motions to suppress.  The court found that the defendant and James felt that they were free to go when Hampton made the request to search the vehicle, and that Hampton did not illegally

7

detain them prior to requesting consent to search. Accordingly, the court held that the defendant and James voluntarily consented to the search.

At the bench trial, Hampton and the defendant offered testimony similar to their testimony from the suppression hearing. At the conclusion of the bench trial, the court found the defendant guilty on both counts.

On appeal, the defendant argued that Hampton illegally detained him following the traffic stop, thereby tainting the subsequent search that resulted in the discovery of cocaine in the trunk of the vehicle. This court agreed, and we reversed the circuit court's judgment. The State appealed.

In a supervisory order issued on November 26, 2008, the Illinois Supreme Court denied the State's petition for leave to appeal but remanded the case to this court for reconsideration in light of People v. Cosby, 231 Ill. 2d 262 (2008).

ANALYSIS

On appeal, the defendant argues that the circuit court erred when it denied his motion to suppress. Specifically, the defendant argues that he was illegally seized after the traffic stop had ended, thereby tainting the evidence found in the trunk of the vehicle.

The ruling of a trial court on a motion to suppress evidence frequently presents mixed questions of fact and of law. People v. Smith, 214 Ill. 2d 338, 827 N.E.2d 444 (2005). Because the trier of fact is in the best position to review the evidence and

8

weigh the credibility of the witnesses, the findings of fact of the trial court will not be disturbed unless they are manifestly erroneous. People v. Anthony, 198 Ill. 2d 194, 761 N.E.2d 1188 (2001). However, the circuit court's ultimate determination of whether the evidence should be suppressed is subject to de novo review. See People v. Gipson, 203 Ill. 2d 298, 786 N.E.2d 540 (2003).

The fourth amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Likewise, article I, section 6, of the Illinois Constitution provides similar protections. Ill. Const. 1970, art. I, §6.

In Cosby, the supreme court emphasized that, once a traffic stop has come to an end, an officer's subsequent request to search the vehicle raises the question of whether a new seizure has occurred for fourth amendment purposes. People v. Cosby, 231 Ill. 2d 262 (2008). The analysis applicable to this type of situation is found in United States v. Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and People v. Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556 (1999).

In Mendenhall, the Supreme Court held that a seizure occurs when an individual's movement is restrained by physical force or a show of authority. Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. Furthermore, the Court held:

"[A]person has been 'seized' within the meaning of the

9

Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

The Mendenhall factors do not constitute an exhaustive list; a seizure may be based on other coercive police conduct similar to these factors. People v. Cosby, 231 Ill. 2d 262 (2008).

In Brownlee, our supreme court followed these principles and emphasized that an individual may not be lawfully seized absent reasonable, objective grounds supporting the seizure. Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556. In Brownlee, two officers flanked the front doors of a vehicle after a traffic stop ended, said nothing for approximately two minutes, then requested consent to search the vehicle despite having no probable cause or reasonable suspicion of criminal activity to detain the vehicle's occupants. Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556. In such a situation, our supreme court found that a reasonable individual in the occupants' situation would not feel free to leave and held

10

that the officers' show of authority constituted an illegal seizure. Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556.

In this case, there is no question with regard to the validity of the initial traffic stop or Hampton's search of the vehicle's interior. The question we must address is whether Hampton's request for consent to search the trunk constituted a new seizure of the defendant. See People v. Cosby, 231 Ill. 2d 262 (2008).

At the time Hampton requested consent to search the trunk, the defendant and James were still standing at the front and rear of the vehicle, respectively, pursuant to Hampton's earlier directive. Despite having found nothing illegal in the vehicle's interior, Hampton requested consent from James and the defendant to search the trunk. It is reasonable for one in the position of the defendant and James to conclude that: (1) had the defendant and James ignored Hampton's request and made efforts to leave the scene, Hampton would not have simply allowed them to leave; and (2) given the ongoing directive to stand at opposite ends of the vehicle, compliance with the request to search the trunk was compelled. See Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556. Under these circumstances, we find that a reasonable person in the defendant's position would not feel free to leave at the time Hampton made his request. Thus, the defendant and James were subjected to a seizure. See Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556.

11

As previously noted, Hampton, who testified that he was suspicious of the strong fragrance emanating from the vehicle, did not find any contraband in the vehicle's interior. The only item of some note he found was a bottle containing a fragrant liquid. However, the presence of a strong fragrance, without more, is insufficient to establish probable cause or a reasonable, articulable suspicion of criminal conduct. See Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556. We also note that Hampton knew James was on mandatory supervised release. However, Hampton did not know why James had been incarcerated. The knowledge of James' parole status, coupled with the strong fragrance, does not constitute probable cause or a reasonable, articulable suspicion of criminal conduct. Thus, at the time he requested consent to search the trunk, Hampton lacked reasonable, objective grounds to justify the continued detention of the defendant and James. See Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556. Without such grounds, Hampton's seizure of the defendant and James was unlawful. See Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556.

An illegal seizure may taint a subsequent consent to search. People v. Brownlee, 186 Ill. 2d 501, 713 N.E.2d 556 (1999) (citing Wong Sun v. United States, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963)). Here, the defendant and James were illegally detained at the time they gave consent to the search. The consent and the resulting search were both tainted, and the fruits thereof should have been suppressed. Brownlee, 186 Ill.

12

2d 501, 713 N.E.2d 556 (citing Wong Sun, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407).

Our decision on the first issue obviates the need to address the defendant's monetary credit argument.

The judgment of the circuit court of Henry County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

O'BRIEN, P.J., concurs.

CARTER, J., dissenting:

I respectfully dissent from the majority's conclusion in the present case. It is my opinion, based on our supreme court's ruling in People v. Cosby, No. 100681 (September 18, 2008), that the majority's position can no longer be maintained. In Cosby, a case with facts nearly identical to that of the present case, our supreme court found that a new seizure of the defendant did not occur and that the consent that the defendant gave for a search of the vehicle was valid. Cosby, slip op. at 17. The same conclusion is mandated in the present case.

At the hearing on the motion to suppress in the present case, officer Hampton testified that after he received the information regarding defendant, the passenger (James), and the vehicle, he gave defendant back his identification card and told defendant that he was free to leave. Hampton specifically testified that he was the only officer at the location of the traffic stop and that before he asked for consent to search the trunk of the vehicle, he did not draw his weapon, he did not

13

handcuff defendant or James, and he did not tell defendant or James that they could not leave. Moreover, no evidence was presented to suggest that Hampton's tone of voice or language was such as to indicate that compliance with his request was required. Contrary to the analysis set forth in Cosby, the majority's analysis in the present case places no significance on the complete absence of any of the Mendenhall factors in defendant's encounter with officer Hampton. Thus, I would respectfully disagree that under the circumstances of this case, a reasonable person in defendant's position would not feel free to leave, given the absence of the Mendenhall factors. That Hampton did not find anything in the passenger area of the vehicle does not somehow taint Hampton's request to search the trunk of the vehicle. Such a conclusion would essentially return us to the approach set forth in People v. Gonzalez, 204 Ill. 2d 220, 789 N.E.2d 260 (2003), an approach which our supreme court has clearly rejected. See Cosby, slip op. at 10. Given our supreme court's analysis in Cosby and its previous analysis in People v. Luedemann, 222 Ill. 2d 530, 857 N.E.2d 187 (2006), it is inappropriate for this court to speculate on what would have happened if defendant and James had either ignored the officer's request to search or had refused it and then to use that rationale to support a finding that compliance with the request to search was compelled.

In addition, in ruling on the motion to suppress, at least as to the issue of whether consent was given, the trial judge

14

found Hampton's testimony to be more credible than that of defendant or James. It is clear from the trial judge's written comments in the order denying the motion to suppress and his oral comments at the hearing on defendant's motion to reconsider that the credibility of the witnesses played at least some part in the trial judge's ultimate conclusion. The majority's ruling in the present case makes no mention of the trial judge's determination of credibility.

For the reasons stated, I respectfully dissent.